In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-2604

APOSTOLOS XANTHOPOULOS,

*Petitioner*,

*v.*

UNITED STATES DEPARTMENT OF LABOR,
ADMINISTRATIVE REVIEW BOARD,

*Respondent*,

*and*

MARSH & MCLENNAN COMPANIES, INC.,
doing business as MERCER INVESTMENT CONSULTING LLC,

*Intervening Respondent*.

_____

Petition for Review of an Order of the
United States Department of Labor.
No. 2019-0045

_____

SUBMITTED FEBRUARY 17, 2021[*] — DECIDED MARCH 22, 2021

_____

[*] We granted the parties' joint motion to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the Court. Fed. R. App. P. 34(a)(2)(C).

Before SYKES, *Chief Judge*, and FLAUM and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge.* Petitioner Apostolos Xanthopoulos, Ph.D., detected securities fraud by his former employer, intervening respondent Marsh & McLennan Companies, Inc., doing business as Mercer Investment Consulting ("Mercer"). When he blew the whistle by reporting his suspicions to the United States Securities and Exchange Commission ("SEC"), Xanthopoulos also indicated his fear that his reports to the SEC might jeopardize his job.

When, by his account, Xanthopoulos's fears of reprisal came true, he filed a Sarbanes-Oxley complaint with the United States Department of Labor's Occupational Safety and Health Administration ("OSHA"). That complaint exceeded the 180-day statute of limitations for filing that type of complaint, so the Department of Labor dismissed it. Now, Xanthopoulos petitions this Court to review whether any of his reports to the SEC tolled the 180-day period for his Sarbanes-Oxley complaint. Xanthopoulos has not articulated a sufficient ground to equitably toll his untimely complaint, so we deny his petition for review.

## I.   Background

### A.  Federal Whistleblower Legal Landscape

Two statutes lie at the heart of this case: the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). Given the centrality of these two laws to the single dispute in this petition, we begin by describing the statutory backdrop before turning to the facts of the petition.

### 1. *Sarbanes-Oxley*

At issue in this case is an alleged violation of Sarbanes-Oxley, which Congress enacted in 2002 "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 773 (2018) (quoting *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014)). Sarbanes-Oxley shields "employees at risk of retaliation for reporting corporate misconduct." *Id.* (citing 18 U.S.C. § 1514A). More specifically, § 1514A(a)(1) prohibits certain companies from discharging and discriminating "in the terms and conditions of employment" against an employee who (among other things) "provide[s] information … or otherwise assist[s] in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of" certain securities laws.

To recover for a Sarbanes-Oxley violation, a person must file a complaint with OSHA.[1] *See* 18 U.S.C. § 1514A(b)(1)(A); Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 77 Fed. Reg. 3912 (Jan. 25, 2012) ("delegat[ing] authority and assign[ing] responsibility" to OSHA for enforcement of Sarbanes-Oxley). He or she must file that complaint within 180 days of the violation.[2] *See* 18 U.S.C. § 1514A(b)(2)(D). Under Sarbanes-Oxley, "[a]n employee who prevails in a proceeding

---

[1] Subject to limited exceptions the parties agree are not relevant here. *See* 18 U.S.C. § 1514A(b)(1)(B).

[2] The statute also permits the action to be "commenced not later than 180 days … after the date on which the employee became aware of the violation," but both parties agree this provision is not relevant to this case. *See* 18 U.S.C. § 1514A(b)(2)(D).

under § 1514A is 'entitled to all relief necessary to make the employee whole.'" *Digit. Realty*, 138 S. Ct. at 773 (quoting 18 U.S.C. § 1514A(c)). Such relief includes "reinstatement, backpay with interest, and any 'special damages sustained as a result of the discrimination,'" *id.*, which includes "litigation costs, expert witness fees, and reasonable attorney fees," 18 U.S.C. § 1514A(c). Nevertheless, this "remedial scheme [is] limited to actual damages." *Digit. Realty*, 138 S. Ct. at 778. Finally, to initiate OSHA's investigation of a Sarbanes-Oxley complaint, a person may submit an online form, which is available on OSHA's website (the "OSHA Form").[3] *See* 29 C.F.R. § 1980.103(b)–(d) (2015) (allowing complaints in writing including through electronic transmittal).

### 2. *Dodd-Frank Act and the SEC*

Separately, in 2010 and on the heels of the 2008 financial crisis, Congress enacted Dodd-Frank, which aims to "promote the financial stability of the United States by improving accountability and transparency in the financial system," *Digit. Realty*, 138 S. Ct. at 773 (quoting 124 Stat. 1376), and

---

[3] *See, e.g., OSHA Online Whistleblower Complaint Form*, OSHA, https://www.osha.gov/whistleblower/WBComplaint.html (last visited Mar. 19, 2021). During the period relevant to this petition, the OSHA Form included the following prompts: "Have you suffered an 'adverse action'?"; "When did you suffer the most-recent adverse action?"; "Why do you believe you suffered the adverse employment action(s)?"; "When you suffered the adverse action, who did you work for?"; "When you suffered the adverse action, where was your worksite?"; "How can OSHA contact your employer?"; and "How can OSHA contact you?" The OSHA Form did not ask the complainant about remedies, nor did it reference whistleblower awards.

which "responded to numerous perceived shortcomings in financial regulation," *id.*

Though Dodd-Frank shares Sarbanes-Oxley's purpose of "root[ing] out corporate fraud" and likewise "shield[s] whistleblowers from retaliation," Dodd-Frank "differ[s] in important respects." *See id.* at 772. The shield takes a different shape: For example, Dodd-Frank's anti-retaliation provision covers only a "circumscribed," *id.*, class of whistleblowers who report suspected violations to the SEC, *see id.* at 777 (holding employee did not qualify as "whistleblower" under 15 U.S.C. § 78u-6(h) because he did not report alleged violation to the SEC). However, "the Sarbanes-Oxley anti-retaliation provision covers employees who report fraud not only to the SEC, but also to any other federal agency, Congress, or an internal supervisor." *See id.* at 778 (citing 18 U.S.C. § 1514A(a)(1)).

Moreover, Dodd-Frank charts a different path to recovery for whistleblowers than Sarbanes-Oxley. A person who seeks to remedy retaliation under Dodd-Frank may file a lawsuit against his or her employer directly in federal court, without first initiating that complaint with a federal agency. *See id.* at 774–75 (citing 15 U.S.C. § 78u-6(h)(1)(B)(i)). Neither OSHA nor the SEC even have authority to adjudicate a Dodd-Frank retaliation claim. *See generally* 15 U.S.C. § 78u-6. Dodd-Frank also provides a generous statute of limitations—six years from the violation—rather than 180 days under Sarbanes-Oxley. *See Digit. Realty*, 138 S. Ct. at 774–75 (citing first 18 U.S.C. § 1514A(b)(2)(D); and then § 78u-6(h)(1)(B)(iii)(I)(aa)).

The remedies for a Dodd-Frank retaliation claim also differ from those available under Sarbanes-Oxley. Like Sarbanes-Oxley, Dodd-Frank "authorizes reinstatement and

compensation for litigation costs, expert witness fees, and reasonable attorneys' fees." *Id.* at 775 (citing first § 78u-6(h)(1)(C)(i), (iii); and then 18 U.S.C. § 1514A(c)(2)(A), (C)). However, "Dodd-Frank instructs a court to award to a prevailing plaintiff double backpay with interest," as contrasted with Sarbanes-Oxley's actual damages limit. *Id.* (citing first § 78u-6(h)(1)(C)(ii); and then 18 U.S.C. § 1514A(c)(2)(B)).

Finally, apart from the "anti-retaliation" provision described above, Dodd-Frank authorizes incentives not available under Sarbanes-Oxley. Dodd-Frank permits the SEC to provide a monetary award to "whistleblowers who voluntarily provided original information to the [SEC] that led to the successful enforcement of the covered judicial or administrative action." 15 U.S.C. § 78u-6(b)(1). The person must seek the award from the SEC. *See* 15 U.S.C. § 78u-6(c)(1)(A); *see also id.* § 78u-6(f) (granting SEC discretion to issue award subject to federal appellate review). Sarbanes-Oxley authorizes no such award, and OSHA does not participate in the administration of Dodd-Frank whistleblower awards. In sum and as relevant to this petition, Dodd-Frank differs from Sarbanes-Oxley in scope, procedure, and remedies.

Before turning to the facts, we note yet one final and distinct feature of this securities fraud landscape. The SEC invites the public to submit "tips, complaints, and referrals" regarding suspected securities fraud through an electronic form (the "TCR Form") on the SEC's website. *See, e.g., Report*

*Suspected    Securities    Fraud    or    Wrongdoing*,    SEC,
https://www.sec.gov/tcr (last modified Mar. 5, 2021).[4]

The SEC's TCR Form, however, serves a different function
than the Sarbanes-Oxley OSHA Form. While the OSHA Form
may be used to notify OSHA of a Sarbanes-Oxley complaint,
the SEC's TCR Form does not affirmatively indicate that sub-
mission of the form will initiate a formal lawsuit under the
federal securities law. However, it appears the TCR Form may
pave the way for seeking a whistleblower award.

### B.  Factual Background

Turning to the facts of this case, petitioner Xanthopoulos
was a Senior Consultant for Mercer from 2013 through 2017.
Mercer is a self-described "human resources consulting firm
and institutional investment advisor." Xanthopoulos's rela-
tionship  with  Mercer  soured  quickly  when  he  detected

---

[4] In contrast to the OSHA Form, during the period relevant to this pe-
tition, the questions on the TCR Form centered on both the nature of the
user's "complaint" and a range of related topics. First, the TCR Form in-
cluded questions about the basic who, what, where, and when of the al-
leged violation. Second, the TCR Form asked if the complainant had ex-
plored other reporting avenues. Third, the TCR Form asked about poten-
tial consequences for the complainant. It prompted the complainant to
"[i]dentify … information in your submission that you believe could rea-
sonably be expected to reveal your identity" including if the contents of
the complaint were "disclosed to a third party."

The TCR Form's format and language also evolved during the period
relevant to this case. While the questions remained nearly the same, there
were two notable exceptions. First, by February 7, 2018, the TCR Form ap-
pears to add: "Does the whistleblower want to be eligible to apply for a
whistleblower award?" Second, it adds: "Were you retaliated against for
reporting the matter at issue in this submission either internally at the en-
tity or to a regulator?"

securities fraud. In his view, Mercer was manipulating invest-
ment portfolio ratings and knowingly disseminating those
ratings to clients. Xanthopoulos alleges that he raised these
concerns with Mercer to no avail.

When Xanthopoulos's internal complaints fell on deaf
ears, he turned to regulators. Though we describe several
pathways for whistleblowers in Part A, at this juncture, Xan-
thopoulos chose just one path: the SEC's "tips, complaints,
and referrals" website and the electronic TCR Form. On
March 3, 2014, Xanthopoulos filled out the first in a series of
TCR Forms that detailed his concerns about Mercer's miscon-
duct. The parties dispute the total and timing, but Xanthopou-
los alleges he submitted seven separate TCR Forms from
March 14, 2014, through June 26, 2018. He prepared all TCR
Forms himself and was not represented by counsel at any
point during the four-year period.

All seven TCR Forms focused on Mercer's misconduct but
varied in content. The majority of Xanthopoulos's TCR Forms
focused on Mercer's ratings manipulation. The following is an
excerpt of questions ("Q") and Xanthopoulos's answers ("A")
from the first TCR:

> Q: Nature of complaint:
>
> A: Company's ratings do not account for port-
> folio performance
>
> … .
>
> Q: State in detail all facts pertinent to the alleged
> violation. Explain why the complainant believes
> the acts described constitute a violation of the
> federal securities laws. …

A: The employer knowingly disseminates rat-
ings (by selling them to clients) that do not ap-
pear to capture reality, as perceived by the cli-
ents. The employer misleads clients.

… .

Q: Provide any additional information you
think may be relevant.

A: The potential impact on the investment pub-
lic is very large. Mercer has many clients, and
advises for accounts that total roughly 9 trillion
dollars (Exhibit H)[.] The company is not using
my help, which I offer openly (Exhibit I). This is
<u>unfair</u>[.]

Xanthopoulos's responses in his October 2017 TCR Form[5]
similarly focused on securities fraud. Under the section enti-
tled "Tell us about your complaint," Xanthopoulos wrote:

Q: Provide additional details about your com-
plaint:

A: There is no relation between performance of
portfolio strategies listed in the [Generalized In-
vestment Management Database] system, and
the ratings assigned by the five individuals
named above, to fixed income strategies that I

---

[5] In his petition, Xanthopoulos refers to two different filings in Octo-
ber 2017: one dated October 3, 2017, and a second dated October 12, 2017.
Despite his claim of two different filings, there is only one October 2017
TCR Form in his Appendix (designated TCR 1507870144638), and there-
fore we assume that he filed but one. We refer to it throughout this opinion
as filed "October 2017."

have come in contact with, researched, or ana-
lyzed using the firm's data, and generally ac-
cepted methodologies. Through its ratings,
Mercer is effectively asking its clients to take
part in a game of luck, the parameters of which
Mercer itself, has not concretely established.

Just as Xanthopoulos predicted in his SEC filings, Mercer
fired him that same month, on October 3, 2017. Though Xan-
thopoulos was discharged, he continued to file TCR Forms
with the SEC, on January 16, February 7, March 10, and June
26, 2018.

However, Xanthopoulos's January 16, 2018 TCR Form
specifically focused on Mercer's mistreatment of Xanthopou-
los, as distinct from the securities fraud. In his filing, Xan-
thopoulos wrote:

Q: Provide additional details about your com-
plaint:

A: I believe the employer has already retaliated
against me (I was fired) because I contacted the
[SEC], and an SEC investigation on-site ensued
immediately afterward. I believe Mercer found
out, that it was me who 'caused' the investiga-
tion, based on information I have from
sources. … . I am in essence punished, because
(i) I adhere to the truth, and (ii) I refuse to suc-
cumb to implicit pressure by this behemoth in
consulting services, as most everybody else ap-
pears to do, because of Mercer's size and ability
to influence the future existence of portfolio
managers.

He also elaborated on Mercer's mistreatment of him in re-sponse to other prompts.

Nevertheless, in the three TCR Forms Xanthopoulos sub-sequently filed, his focus shifted back to the securities fraud. In his filings on February 7, March 10, and June 26, 2018, for example, a nearly identical question ("In your own words, de-scribe the conduct or situation you are complaining about.") elicited answers about the portfolio manipulation, not Mer-cer's mistreatment. In the February 7, 2018 TCR Form, he de-scribes his doubt about a reported success rate by one of the firm's employees. In the March 10, 2018 TCR Form, he de-scribes how another colleague "may have witnessed pay for play." Finally, in the June 26, 2018 TCR Form, he describes his suspicion that "[s]elf-proclaimed 'professionals' … used com-pany resources[] to further their own careers."

Every TCR Form Xanthopoulos submitted between 2014 and 2018 also specifically referenced a whistleblowing award. For every submission, he signed a "Whistleblower's Declara-tion," which required him to "declare under penalty of per-jury … the information contained herein is true … . [and that he] fully underst[ood] that [he] may be … ineligible for a whistleblower award if … [he] … make[s] any false … repre-sentations." Furthermore, the four TCR Forms he submitted from February 7, 2018, onward explicitly invited Xanthopou-los to request an incentive for his reports. Xanthopoulos an-swered affirmatively that he "want[ed] to be eligible to apply for a whistleblower award" on the February 7, March 10, and June 26, 2018 TCR Forms.

Finally, Xanthopoulos included one last remark that raised questions in hindsight. In the June 26, 2018 TCR Form, he elaborated on his suspicion of workplace sexual

harassment. He closed: "I am currently investigating my options, regarding this possible case of sexual harassment against me. This is on top of the wrongful termination, as the case may be, and/or illegal retaliation under the whistle-blower protection of the Dodd-Frank [A]ct."

### C. Procedural Background

Xanthopoulos ultimately opted for a second path: He filed an administrative complaint with OSHA on September 18, 2018 ("the Complaint"). Filing *pro se* using the online OSHA Form described above, Xanthopoulos alleged violations of Sarbanes-Oxley's anti-retaliation provision. In the Complaint, Xanthopoulos indicated he had suffered numerous adverse actions: termination/layoff, demotion/reduced hours, negative performance evaluation, and harassment/intimidation. In responding to the prompt "why … [he] believe[d] [he] suffered the adverse employment action(s)," Xanthopoulos indicated: "[c]omplained to management about unlawful conditions, conduct, or practices," and "[t]estified or provided statement in a proceeding (e.g., government inspection or investigation)."

On October 22, 2018, OSHA's Regional Administrator dismissed the Complaint as untimely filed because Xanthopoulos filed 350 days after Mercer discharged him. Still unrepresented by counsel, he filed objections and requested a hearing before the Administrative Law Judge ("ALJ") on November 15, 2018. In that request, he elaborated on why he delayed filing the Complaint, stating, among other things, that "there was no[] 180-day-period[] in which [he] could have decided in clear conscience, that [he] had every information needed, to contact OSHA." By his own account, he "had delayed contacting OSHA, until September 2018" because he "found

evidence outside Mercer in support of such [a] claim, on September 2018, <u>for the first time</u>."

The ALJ issued an order to show cause on January 18, 2019, directing Xanthopoulos to address why equitable tolling principles should apply to his otherwise belated complaint. Xanthopoulos, then represented by counsel, argued that he filed the precise statutory claim in the wrong forum, which tolled the statute of limitations on the 180-day period. Specifically, he argued that the TCR Forms he submitted to the SEC (described above, Part B) constituted Sarbanes-Oxley claims mistakenly filed in the wrong forum. The ALJ issued a decision and order on March 22, 2019, dismissing the complaint as untimely and finding no grounds for equitable tolling. Xanthopoulos appealed to the United States Department of Labor's Administrative Review Board (the "Board"), which affirmed the ALJ's findings on June 29, 2020.

Xanthopoulos timely petitioned this Court for review of OSHA's dismissal of his Complaint.

## II.    Discussion

The parties agree that the Complaint Xanthopoulos filed detailing violations of Sarbanes-Oxley was not timely because it was filed 350 days after his termination. *See* 18 U.S.C. § 1514A(b)(2)(D) (requiring filing "not later than 180 days after the date on which the violation occurs"). Therefore, the sole question before us is whether any of the TCR Forms he submitted on the SEC's "tips, complaints, and referrals" website between 2014 and 2018 equitably tolled the statute of limitations on his Complaint.

We review the Board's answer to that question pursuant to the deferential standard of the Administrative Procedure

Act (the "APA").[6] Under the APA, we may not overturn the Board's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Specifically relevant to this case, "we review the denial of equitable tolling for an abuse of discretion." *Sparre v. U.S. Dep't of Lab.*, 924 F.3d 398, 404 (7th Cir. 2019). Our aim is to "examine whether the Board's reasoning was sound and supported." *Id.* at 404. Moreover, we must uphold the Board's factual findings so long as they are "supported by substantial evidence." *Roadway Express, Inc. v. U.S. Dep't of Lab.*, 612 F.3d 660, 664 (7th Cir. 2010) (citing 5 U.S.C. § 706(2)(E)). To satisfy this standard, the Board "must rely on 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.'" *Id.* (quoting *Roadway Express, Inc. v. U.S. Dep't of Lab.*, 495 F.3d 477, 483 (7th Cir. 2007)).

The doctrine of "equitable tolling 'pauses the running of, or "tolls" a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action.'" *Madison v. U.S. Dep't of Lab.*, 924 F.3d 941, 946–47 (7th Cir. 2019) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014)).

Nevertheless, "[f]ederal courts have typically extended equitable relief only sparingly." *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990). This pattern honors the fact that "[a]lthough any statute of limitations is necessarily arbitrary,

---

[6] The rules and procedures for Xanthopoulos's action are governed by 49 U.S.C. § 42121(b)(4)(A). *See* 18 U.S.C. § 1514A(b)(2)(A). Section 42121 authorizes this Court to review the Board's final order under the APA's standard of review. *See* 49 U.S.C. § 42121(b)(4)(A).

the length of the period … reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463–64 (1975); *See, e.g., E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 867 (7th Cir. 2014) (discussing statutes of limitations' role in limiting "cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise" (quoting *United States v. Kubrick*, 444 U.S. 111, 117 (1979)). "Given the compelling showing that is required to successfully invoke equitable tolling and to show that an agency abused its discretion, it will be the rare case in which we will find that an agency's refusal to equitably toll a time limit was out of bounds." *Madison*, 924 F.3d at 947 (citing *Johnson v. Gonzales*, 478 F.3d 795, 799 (7th Cir. 2007)). "The plaintiff bears the burden of showing he 'diligently' pursued the claim and 'some extraordinary circumstances' prevented him from filing his complaint within the statute of limitations." *Sparre*, 924 F.3d at 402–03 (quoting *Blanche v. United States*, 811 F.3d 953, 962 (7th Cir. 2016)).

We have recognized several narrow circumstances that warrant equitable tolling. Relevant to this petition, those situations include where "the claimant 'has made a good faith error (*e.g.*, brought suit in the wrong court).'" *Threadgill v. Moore USA, Inc.*, 269 F.3d 848, 850 (7th Cir. 2001) (quoting *Jones v. Madison Serv. Corp.*, 744 F.2d 1309, 1314 (7th Cir. 1984)); *see also Irwin*, 498 U.S. at 96 ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period … ."). The Board similarly permits tolling "when

the movant has raised the precise statutory claim in issue but has done so in the wrong forum." *Sparre*, 924 F.3d at 403.

In defining what qualifies for the "wrong forum" exception, the parties have not pointed to—nor could we find—a case from this Court that elaborates on this exception in an administrative setting. However, we do have clues from the Title VII context. In *Johnson v. Railway Express*, the Supreme Court reasoned that claims for remedies under Title VII and 42 U.S.C. § 1981, "although related, and … directed to most of the same ends" do not qualify where they were "separate, distinct, and independent." *See* 421 U.S. at 461. In holding petitioner's timely filed 42 U.S.C. § 1983 claim did not toll his 42 U.S.C. § 1981 action, *see id.* at 467, the Court emphasized in part Congress' clear choice to "confer[] … independent administrative and judicial remedies," *id.* at 461.

We have construed *Johnson v. Railway Express* to mean that "pursuit of an administrative remedy *unrelated* to a later filed federal claim does not toll the statute of limitations for the federal claim." *Cheeney v. Highland Cmty. Coll.*, 15 F.3d 79, 82 (7th Cir. 1994) (emphasis added). "The Supreme Court in *Johnson [v. Railway Express]* focused on the independence of Title VII from other remedies … ." *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 550 (7th Cir. 1987) ("*Artim Transportation System*"). That is because "[o]nly where there is complete identity of the causes of action will the … courts have an opportunity to assess the influence of the policy of repose inherent in a limitation period." *Id.* (alterations in original) (quoting *Johnson v. Ry. Express*, 421 U.S. at 468 n.14).

For example, in *Artim Transportation System*, we determined that an earlier-filed Title VII action did not toll the statute of limitations on a fair-representation claim. *Id.* We

explained that the fair-representation claim was "independent of and separate from the Title VII claim" because the former "allege[d] the company's breach of the collective bargaining agreement and the union's failure to protect the plaintiff's rights under that agreement," while the latter involved the company's or union's allegedly "discriminatory conduct." *Id.* In rejecting such "cross-statute tolling," *id.* at 549, we also relied on the Supreme Court's acknowledgment that the two claims "have legally independent origins and are equally available to the employee," *id.* at 550 (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974)). *See also Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322–23 (7th Cir. 1992) (holding plaintiff's earlier-filed Title VII claim did not toll the statute of limitations on an invasion of privacy claim).

In determining whether there is a "complete identity of the causes of action" for equitable tolling, we therefore ask: Are "the remedies available" for the earlier, timely filed claim "separate, distinct, and independent" from those of the belated claim? *See Artim Transp. Sys.*, 826 F.2d at 550; *Johnson v. Ry. Express*, 421 U.S. at 461. If the answer to that question is yes, then the statute of limitations is not tolled.

Shifting to the case before us, the Board concluded that Xanthopoulos did not qualify for equitable tolling because the TCR Forms did not contain "the precise statutory claim," the Sarbanes-Oxley claims, alleged in his Complaint. In the Board's view, the "primary purpose" of the TCR Forms that Xanthopoulos submitted "was to right the underlying wrong" of fraud, not investigate retaliation. The Board reasoned Xanthopoulos "did not seek employee-based remedies such as reinstatement, back pay, or other damages associated with the termination." Nor did he later "indicate[] that [he]

sought or wanted the SEC to investigate his discharge or re-store his employment or wages to him." Finally, the Board noted that Xanthopoulos's statement that he was investigating filing suit for the sexual harassment case "concedes [his] awareness (1) that he must seek further legal action … in some forum other than the SEC and (2) that the SEC is not investigating these matters." Stated another way, the Board concluded that Xanthopoulos used the SEC's website to blow the whistle on Mercer's corporate securities fraud, not on Mercer's retaliation against Xanthopoulos.

Xanthopoulos argues the Board's conclusion that the TCR Forms he filed between 2014 and 2018 did not toll the 180-day limitation period on his Complaint is not supported by substantial evidence. He advances three reasons. First, he asserts that the TCR Forms described Mercer's retaliatory conduct *and* securities fraud. Thus, his reports of securities fraud did not necessarily "negate" the retaliation claims therein. Second and relatedly, he argues that he alleged a retaliation claim, and his failure to explicitly ask the SEC to investigate and to provide "employee-based" remedies does not detract from that. Finally, he insists that his indication in the June 26, 2018 TCR Form that he was considering suing Mercer for sexual harassment also did not "negate" his Sarbanes-Oxley claim.

We hold that the Board's conclusion that Xanthopoulos's TCR Forms did not equitably toll the limitations period for his Complaint was sound and supported by adequate evidence. The TCR Forms that Xanthopoulos filed with the SEC were "independent of and separate from" his later-filed Complaint for retaliation. *Artim Transp. Sys.*, 826 F.2d at 550. Both the prompts and his responses in the TCR Forms were directed at securities fraud: When asked to describe the overarching

"[n]ature of [his] complaint," Xanthopoulos described the performance ratings or the pay-to-play arrangement in all but one filing. Xanthopoulos's submissions reflect a multi-year campaign to use the SEC's "tips, complaints, and referrals" website to bring Mercer's fraud to the SEC's attention. All Xanthopoulos's filings declared his eligibility for or affirmatively requested a whistleblower award—an incentive specifically designed to encourage whistleblowing, as distinct from curing retaliation. *See Digit. Realty*, 138 S. Ct. at 774–75. As the Supreme Court explained in *Johnson v. Railway Express*, it is not enough that the TCR Forms were "directed to most of the same ends" of broadly addressing corporate malfeasance—which animate both Dodd-Frank's and Sarbanes-Oxley's frameworks. *See* 421 U.S. at 461. Xanthopoulos sought not to "vindicate [his] right to be free from" retaliation under Sarbanes-Oxley in the TCR Forms but rather to prosecute Mercer's securities fraud, a "separate and independent remed[y]." *See Juarez*, 957 F.2d at 322–23. The evidence thus supported the Board's conclusion that Xanthopoulos's "filings do not constitute the 'precise statutory claim' 'mistakenly' filed in the wrong forum."

Xanthopoulos's argument that the TCR Forms had a dual purpose—to report his retaliation in addition to fraud—does not affect our legal conclusion. We can assume without deciding that the January 16, 2018 TCR Form focused on retaliation, not securities fraud. That is because even if we assume that Xanthopoulos filed this TCR Form to cure the retaliation, the record suggests Xanthopoulos sought Dodd-Frank's anti-retaliation protections, not Sarbanes-Oxley's. He characterized his complaint as alleging "illegal retaliation *under the Dodd-Frank [A]ct*" in the June 26, 2018 TCR Form,

and again in his objections to the ALJ.[7] (Emphasis added). Although he made those statements while filing *pro se*, once he obtained counsel, he doubled down on this characterization. Specifically, in his petition he describes his claim as a "claim for wrongful termination *pursuant to the Dodd-Frank Act*." (Emphasis added). Together with the invocation of a "whistleblower award," which is only available under Dodd-Frank (not Sarbanes-Oxley), his characterizations make clear that Xanthopoulos did not file a Sarbanes-Oxley complaint prior to September 2018, let alone accidentally file it with the SEC.

A Dodd-Frank claim is separate from a Sarbanes-Oxley one, with distinct objectives, procedures, meant for a different forum, and assigned a different statute of limitations and remedies. *See Digit. Realty*, 138 S. Ct. at 772–75, 778. Thus, even if his TCR Form constituted a retaliation filing, there is no "complete identity of the causes of action," *Artim Transp. Sys.*, 826 F.2d at 550, between the TCR Forms and the subsequent belated Complaint because Xanthopoulos's Dodd-Frank claim has a "separate, distinct, and independent" remedy from the later filed Sarbanes-Oxley one, *Johnson v. Ry. Express*, 421 U.S. at 461. Like the two claims in *Artim Transportation Systems*, anti-retaliation claims under Dodd-Frank and Sarbanes-Oxley "have legally independent origins and are equally available to the employee." 826 F.2d at 550 (quoting *Alexander*, 415 U.S. at 52). Xanthopoulos's retaliation-focused

---

[7] Specifically, he wrote "I had engaged in activity protected by the Whistle-Blower provision of the 2010 Dodd-Frank Law[,]" and later, "I had thought of this matter as an SEC Whistle-Blower issue, under Dodd-Frank."

TCR Forms therefore do not qualify as the same claim filed in the wrong forum.

Given the distinctions between and equal availability of Dodd-Frank and Sarbanes-Oxley anti-retaliation claims, Xanthopoulos's reliance on *Turgeau v. Administrative Review Board*, 446 F.3d 1052 (10th Cir. 2006), is misplaced. In that case, the Tenth Circuit granted a petition for review on the grounds of equitable tolling where the earlier-filed claim was completely preempted by federal law. *Id.* at 1058–59. Unlike the petitioner there, Xanthopoulos's private right of action for retaliation under Dodd-Frank means his belated Sarbanes-Oxley claim is not "the only remedy petitioner ha[s] for the alleged wrongful discharge from his … job." *See id.* at 1059–1060 (concluding petitioner's completely preempted claim constituted an identity of action).

In sum, Xanthopoulos did not file a Sarbanes-Oxley claim in the wrong forum. Xanthopoulos's remaining arguments— that the Board drew unreasonable inferences—cannot cure this fundamental defect: The TCR Forms amount to, in the best light for his petition, a Dodd-Frank anti-retaliation claim, and in the worst light, solely an attempt to blow the whistle on securities fraud. Xanthopoulos thus cannot show that the Board's conclusion was not "sound and supported."

### III.    Conclusion

Given two paths to recover for Mercer's alleged retaliation—federal court or OSHA—Xanthopoulos chose OSHA. He could have filed with OSHA at any time after his termination but "slept on" that right for nearly one year. *Johnson v. Ry. Express*, 421 U.S. at 466. "The fact that his slumber may have been induced by faith in the adequacy of"

his attempt to blow the whistle at the SEC is unfortunately "of little relevance inasmuch as the two remedies are truly independent." *Id.*

For the foregoing reasons, we DENY Xanthopoulos's petition for review and AFFIRM the Board's dismissal of Xanthopoulos's Complaint as untimely.