In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 23-3109 & 23-3138

LJM PARTNERS, LTD. and TWO ROADS SHARED TRUST,

*Plaintiffs-Appellants*,

*v.*

BARCLAYS CAPITAL, INCORPORATED, *et al.*,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:19-cv-368 & 1:20-cv-831 — **Manish S. Shah**, *Judge*.

———————————

ARGUED MAY 23, 2024 — DECIDED JANUARY 15, 2026

———————————

Before JACKSON-AKIWUMI, LEE, and PRYOR, *Circuit Judges*.

LEE, *Circuit Judge*. On February 5, 2018, the S&P 500 plunged. As a result, the VIX—a Chicago Board of Exchange ("Cboe") index that measures the expected volatility of the S&P 500—increased abruptly. LJM Partners, Ltd. and Two Roads Shared Trust ("Plaintiffs") traded options on the Chicago Mercantile Exchange ("CME"). They took positions in certain options assuming a low degree of market volatility. This strategy proved catastrophic when volatility skyrocketed

on February 5, 2018. As a result, LJM and Two Roads lost enormous amounts of the money they managed on the CME.

LJM and Two Roads filed two separate lawsuits in the Northern District of Illinois, each alleging that several "John Doe Defendants" had manipulated the VIX to impact the S&P 500-based derivative markets in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6b, 6c, 9, 13, 25. After engaging in several years of litigation to identify the John Doe firms, Plaintiffs eventually amended their complaints to include the names of eight firms ("Defendants"), who they claim manipulated the VIX on February 5, 2018.

Defendants moved to dismiss both complaints, and the district court granted their motion. First, the district court determined that LJM's complaint failed to allege an injury in fact to support Article III standing. Second, it held that Two Roads's claims were barred by the CEA's two-year statute of limitations and declined to apply equitable tolling to excuse the untimeliness. LJM and Two Roads appealed. We affirm.

## I

### A. Plaintiffs' Trading Strategy

LJM was a commodity trading advisor and commodity pool operator that managed approximately fifty accounts. These accounts included those of investors as well as six limited partnership funds for which LJM served as general partner. LJM's affiliate, LJM Funds Management, Ltd., managed a publicly traded mutual fund called the LJM Preservation and

Growth Fund (the "Preservation Fund").[1] That fund was organized as a series of shares of beneficial interest in Two Roads.

The CME is a global futures and options marketplace based in Chicago. The CME lists contracts for various futures, including a standard S&P 500 Future and the E-mini S&P 500 Future ("E-mini"), which is one-fifth the size of the standard version. The CME also offers standard options on these S&P 500 Futures, meaning that—while the underlying instrument is a futures contract—the holder has the right (but not an obligation) to purchase or sell the referenced S&P 500 Future at the strike price (*i.e.*, the price at which the option can be exercised) on the designated expiration date. LJM and the Preservation Fund traded these options to buy and sell S&P 500 Futures and E-minis on the CME.

The VIX is a Cboe-created benchmark volatility index that measures the thirty-day expected volatility in the S&P 500. It is calculated based on the midpoint of bid-ask prices for certain SPX Options.

Plaintiffs centered their trading philosophies around the so-called "volatility premiums" baked into options prices. When a purchaser bought an option from LJM or the Preservation Fund, it paid the companies a premium to protect itself against volatility in the U.S. equity markets. In exchange for this premium, Plaintiffs took on the risk of significant market

---

[1] Although Two Roads brings this suit, the Preservation Fund is the entity that made the transactions at issue. In the facts that follow, we sometimes refer to the trading entities as "Plaintiffs" for ease of reference, even though Two Roads was not itself transacting options.

moves. Essentially, Plaintiffs bet that high volatility would not materialize, and this is how they made their profits.

According to Plaintiffs, this strategy was successful because options buyers typically overestimate the likelihood of high volatility in the market, meaning that implied volatility (the volatility investors predict will occur) generally outpaces actual volatility. As a result, Plaintiffs say, they profited from these premiums because volatility typically does not rise as much as investors fear.

### B. Events of February 5, 2018

This strategy generally worked well for Plaintiffs until market volatility skyrocketed on February 5, 2018. Around 10:30 a.m. that day, the S&P 500 began to sharply decline. As the S&P 500 declined, the VIX increased—first in an orderly manner and then at an unprecedented rate beginning around 1:20 p.m. By 1:57 p.m., the VIX had risen to 27.97, an increase of 61.6% from where it opened that day. Between February 5 and 6, 2018, the S&P 500 dropped 4.1%.

When the market began to decline on February 5, Plaintiffs responded by making adjustment trades to reduce the risk that they would lose money on the options they sold. As the market continued to drop, they entered into more and more adjustment trades, which became increasingly more expensive as the VIX continued to climb.

By the close of trading on February 5, 2018, LJM had adjusted approximately 87.9% of its opening short put positions[2] at purportedly inflated prices—more trades than it had

---

[2] A "short put" is simply the sale of an option on a security.

ever made in a single day. LJM lost approximately $334.9 million on February 5, nearly 65% of its net managed assets. Meanwhile, the Preservation Fund lost $430 million by the close of trading on that day, which amounted to almost 56% of its net managed assets.

Plaintiffs' troubles continued into the next day. As a result of their losses on February 5, Wells Fargo—Plaintiffs' futures clearing merchant—required them to post millions of dollars in additional assets by the February 6 opening bell. When neither LJM nor the Preservation Fund could meet this demand, Wells Fargo required them to promptly close the positions they held in their Wells Fargo accounts. On February 6, LJM and the Preservation Fund short sold E-minis at very low prices to offset their options positions.

All told, on February 5 and 6, LJM lost approximately $446.8 million (or approximately 86.5%) of the total assets it managed. The Preservation Fund lost $610 million (or approximately 80%) of its managed assets.

## C. Plaintiffs' Market Manipulation Theory

Defendants Barclays Capital Inc.; Morgan Stanley & Co. LLC; DRW Securities, LLC; CTC, LLC; Optiver US LLC; Volant Liquidity, LLC; Akuna Securities LLC; and IMC-Chicago, LLC, doing business as IMC Financial Markets, are all Cboe-approved market makers that traded in SPX Options. SPX Options are another type of option, but they are available for trading solely on Cboe.

Because SPX Options, options on S&P 500 Futures, and options on E-minis are all priced based on the S&P 500, they are correlated and move in tandem. According to Plaintiffs, each

of these firms pursued a "long" volatility strategy—that is, they stood to gain when implied volatility was high.

LJM and Two Roads do not view their losses on February 5 and 6 as the natural consequence of their investment strategy. Instead, they describe a detailed scheme by which Defendants allegedly manipulated the market, which caused Plaintiffs to suffer losses that they otherwise would not have incurred. Although the precise mechanisms of the fraud are complicated (and not relevant to this appeal), Plaintiffs' theory boils down to this: Defendants each repeatedly quoted inflated bid-ask prices for out-of-the-money[3] SPX Options during the afternoon of February 5 and the morning of February 6. Plaintiffs claim this increased the midpoint of the SPX Option price on which the VIX is based.

According to Plaintiffs, Defendants' plan worked—their false quotes artificially inflated the prices at which SPX Options were sold. And, because SPX Options move in tandem with S&P 500 Futures and E-minis, Defendants' actions in turn increased implied volatility and caused the prices on Plaintiffs' trades to rise. This, Plaintiffs say, is what caused them to lose over one billion dollars in combined managed assets over two days. In support, Plaintiffs point out that the February 5 VIX spike was 13.7 standard deviations away from the mean settlement price during the previous twelve months, a deviation they insist is "statistically impossible to explain as a result of rational fair market activity."

---

[3] An option is "out-of-the-money" when its strike price is above the current market price. As a result, the option has no extrinsic value because exercising it would not be profitable.

### D. Procedural History

LJM launched its lawsuit on January 18, 2019, alleging that Defendants placed "artificial and manipulative bid-ask quotes on out-of-the-money SPX Options traded on the CBOE" in violation of the CEA and 17 C.F.R. § 180.2. According to LJM, these fraudulent quotes, which Defendants had no intent to execute, increased the VIX, thereby favoring Defendants' investment strategies that assumed high volatility. But, because LJM lacked the information necessary to identify the entities that had allegedly manipulated the market, its complaint merely named "John Doe" defendants as placeholders.

Mindful that the CEA carries a two-year statute of limitations, 7 U.S.C. § 25(c), LJM asked the district court on January 24, 2019, for leave to conduct expedited discovery to ascertain the identity of potential defendants. Before the district court could rule on LJM's motion, however, the Judicial Panel on Multidistrict Litigation deemed the case to be part of a multidistrict litigation involving similar claims of VIX manipulation pending in the Northern District of Illinois (we will refer to this as the "VIX MDL"). The district court overseeing the VIX MDL denied LJM's motion to expedite discovery without prejudice. Although the court acknowledged it was "sensitive to the … statute of limitations," it believed LJM was prematurely seeking broad merits discovery and thought it important to keep LJM's case on the same track as the rest of the MDL.

Four months later, LJM filed a second motion to expedite discovery. The district court again denied it, concluding that, although the discovery schedule in the VIX MDL "put[] LJM in a worse position than it was when it first asked for Doe

discovery," the risks associated with addressing the statute-of-limitations defense later in the proceedings did "not outweigh [its] concern over coordinating all claims of VIX manipulation." In the court's view, LJM was asking for "extensive merits discovery to identify [the Doe defendants]," which would put LJM ahead of the other VIX MDL plaintiffs. Thus, it concluded, allowing LJM to pursue a second, separate track of discovery was not "efficient under the[] circumstances."

On February 4, 2020—two days before the two-year anniversary of the February 2018 market decline—Two Roads filed a complaint asserting the same market manipulation theory as LJM. And, like LJM, Two Roads also named only "John Does" as defendants.

Two Roads's case was immediately reassigned to the VIX MDL, and LJM's and Two Roads's cases proceeded in tandem. Later that month, the two parties filed a joint motion for expedited discovery, claiming this third attempt was more tailored "to target the identity of only those traders who manipulated the relevant instruments." The court agreed and granted the motion, finding the request was "much closer to simply identifying the 'who' and not the 'what' or 'how' of the claims." Given this, the court was less concerned that the discovery request was "being used as a substitute for pre-complaint investigation."

Shortly thereafter, Plaintiffs served Cboe with a subpoena requesting the February 5 and 6 trading records. Cboe moved to quash the subpoena on May 21, 2020, insisting that the request went "well beyond" what the district court held was the "proper scope of Doe discovery." The court granted the motion in part. It agreed with Plaintiffs that Cboe had not shown that the volume of information posed an undue burden, but

it nevertheless narrowed the subpoena to bids and asks limited to "near-term and next-term SPX options used to calculate the spot VIX … and from the normal-hours trading periods on February 5 and 6 and the extended-hours trading period from the early morning of February 6, 2018." The court also ordered Cboe to use aliases when producing the records to protect the identities of market participants.

Plaintiffs received Cboe's first production of this information on July 7, 2020. Then, after discovering an error in the algorithm it had used to generate the aliases that appeared in the data, Cboe produced a corrected version of the dataset to Plaintiffs on November 20, 2020. In January 2021, after rerunning their analysis with Cboe's new dataset, Plaintiffs asked Cboe to produce the identities of five of the seventeen aliases present in the dataset. Cboe in turn informed those firms that Plaintiffs had identified them as potential defendants.

Opposing Plaintiffs' efforts to obtain their identities, the firms then filed an anonymous motion to intervene to prevent the disclosure, which the court granted. Meanwhile, Cboe also refused to provide the identities to Plaintiffs, leading them to file a motion to compel in May 2021, which the district court later denied, believing that the improper conduct Plaintiffs alleged in their motion was "different than the conduct alleged in the complaints."

A short time later, Plaintiffs received leave from the court to amend the complaints. And they filed their amended complaints in November 2021, still naming "John Does" as defendants. This time, the amended complaints alleged that nine firms manipulated SPX Options to increase the VIX, which in turn caused artificially inflated prices for S&P 500 Future and E-mini contracts.

Plaintiffs renewed their motion to compel on December 17, 2021. Satisfied that Plaintiffs finally had shown good cause for early discovery, the court granted the motion to compel on August 16, 2022, and required Cboe to identify the names of eight of the nine firms that were the subject of the motion. Cboe provided Plaintiffs with those names, and on August 30, 2022, Plaintiffs filed a sealed Second Amended Complaint naming seven of the eight firms as defendants. And, just over a month later, Plaintiffs filed a Third Amended Complaint naming the eight Defendants before us now.

On November 4, 2022, the firms jointly moved to dismiss LJM's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). They also moved to dismiss both complaints for failure to state a claim under Rule 12(b)(6). The district court granted the motions and dismissed both complaints. First, it found that LJM had failed to allege an injury in fact sufficient to establish Article III standing. As the court saw it, the only injuries alleged in the complaint were those borne by LJM's customers, not LJM itself. The court also rejected LJM's request to substitute a real party in interest under Rule 17(a)(3), concluding that the procedure "is only available to a plaintiff who has Article III standing." *LJM Partners, Ltd. v. Barclays Cap. Inc.*, No. 19 CV 368, 2023 WL 6311471, at *9 (N.D. Ill. Sept. 28, 2023). Accordingly, the court dismissed without prejudice LJM's complaint for lack of jurisdiction and denied leave to amend, concluding that any amendment would be futile due to CEA's two-year limitations period.

Two Roads's complaint met a similar fate. Faced with the question of when a CEA claim accrues for statute-of-limitation purposes, the district court found that the claim accrues

"when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." In Two Roads's case, this was on February 6, 2018, when it learned of its injury. And, because Two Roads submitted its Third Amended Complaint on September 28, 2022—over four years later—the court found it untimely pursuant to 7 U.S.C. § 25(c). Two Roads also asked the court in the alternative to apply equitable tolling to account for the time it was conducting Doe discovery. But, the district court refused to do so, finding that Two Roads had failed to diligently pursue its claim.

In the interest of completeness, the district court also examined whether Two Roads had stated a CEA claim on the merits and found it did not. The court rejected Two Roads's market manipulation claim for failing to allege that Defendants possessed the specific intent to manipulate the price of a financial instrument. Moreover, it determined that both of Two Roads's CEA claims were barred by the statute of limitations.

LJM and Two Roads appealed, and we consolidated the appeals for disposition.

**II**

Our analysis proceeds in two steps. First, we determine whether Two Roads's complaint was timely and, if not, whether the district court abused its discretion by refusing to apply equitable tolling. Second, we address whether LJM's complaint sufficiently alleges Article III standing and whether LJM's own complaint was filed in a timely manner.

### A. Two Roads

#### 1. Timeliness

A plaintiff seeking relief under the CEA must bring an action no later than "two years after the date the cause of action arises." 7 U.S.C. § 25(c). The principal issue for Two Roads is whether its complaint was timely, and, if not, whether the district court abused its discretion in refusing to apply equitable tolling to save its claims.

As a preliminary matter, Two Roads argues that the district court should have waited until summary judgment to rule on the timeliness of its claims because complaints "need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). But a district court may dismiss on statute-of-limitations grounds where it is "clear from the face of the amended complaint that it is hopelessly time-barred." *Id.* at 675. Here, Two Roads's complaints provide all the information we need to assess their timeliness.

Although Two Roads filed its initial complaint on February 4, 2020, it did not name the Defendants until it filed its Second and Third Amended Complaints on August 30 and September 28, 2022. Two Roads urges us to focus on the first date, arguing that its amended complaints relate back to the filing of the original complaint under Rule 15(c)(1)(C)(ii). This rule allows an amendment adding a defendant to relate back to the filing date of the original complaint if the new defendant "knew or should have known that the action would have been brought against it, but for *a mistake concerning the proper party's identity*." Fed. R. Civ. P. 15(c)(1)(C)(ii) (emphasis added). But, as we have held elsewhere, a plaintiff's

"conscious choice" to file a complaint against a John Doe even though it does not know the defendant's identity is not a "mistake" within the meaning of Rule 15(c)(1)(C)(ii). *Herrera v. Cleveland*, 8 F.4th 493, 499 (7th Cir. 2021). Therefore, the relevant filing date for limitations purposes is August 30, 2022, for all Defendants except IMC-Chicago, which was not added as a defendant until the filing of the Third Amended Complaint on September 28, 2022.

We next examine when the CEA's two-year clock began to run. To do so, we follow the "discovery rule," which provides that "the statute commences to run when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991). According to Defendants, Two Roads had "actual or constructive knowledge" of their alleged market manipulation on February 6, 2018.

In Two Roads's view, its claim accrued only once it discovered Defendants' scienter (that is, their intent to manipulate or defraud the market). And this discovery, according to Two Roads, did not occur until sometime after it received the corrected Cboe data in November 2020. To support this argument, Two Roads points to the fraud-specific discovery rule outlined in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010), which provides that a fraud is "discovered" only when a plaintiff knows or should know the "facts that will form the basis" of the claim. *Id.* at 646. In *Merck*, the Supreme Court concluded that a defendant's intent to manipulate or defraud is among the facts necessary to discover the wrongful conduct for accrual purposes. *Id.* at 648–49.

Before moving to the substance of Two Roads's argument, we note that the plaintiffs' claims in *Merck* arose under § 10(b) of the Securities Exchange Act of 1934, not the CEA. And there is some reason to question *Merck*'s applicability here. For example, the text of the statute of limitations at issue in *Merck* contains additional language that is not present in 7 U.S.C. § 25(c). *Compare* 28 U.S.C. § 1658(b) (stating that claims may not be brought more than "2 years after *the discovery of the facts constituting the violation*") (emphasis added), *with* 7 U.S.C. § 25(c) (stating only that a CEA claim "shall be brought not later than two years after the date the cause of action *arises*") (emphasis added). We have previously observed that this language makes *Merck*'s holding "hard to impute" to the CEA. *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 536 (7th Cir. 2011). However, as we did in *Premium Plus*, we will assume *Merck* applies, because doing so does not change the outcome of our analysis. *Id.*

First, we note that Two Roads failed to raise this scienter-based argument to the district court, thereby forfeiting it on appeal. *See St. Paul Fire & Marine Ins. Co. v. Schilli Transp. Servs. Inc.*, 672 F.3d 451, 460 (7th Cir. 2012). But even if Two Roads had done so, we would still be unconvinced.

Despite its insistence that it had no way of ascertaining Defendants' scienter until after it had received the Cboe data, the allegations in Two Roads's complaint indicate otherwise. For example, its initial complaint asserted that "it is virtually impossible that the historic increase in the VIX on February 5, 2018 was the result of legitimate market activity, and instead, supports the conclusion that it resulted due to *manipulation* by John Doe Defendants." (emphasis added). Indeed, Defendants' intent to manipulate formed the crux of Two Roads's

original CEA claims. Thus, Two Roads's current argument is fatally undermined by its own allegations.

On a related note, Two Roads insists the district court erred in assuming that its claim accrued on February 6, 2018. Although it learned of its losses that day, Two Roads argues, it did not understand that its losses were caused by illegal market manipulation until much later. But Two Roads had reason to know the cause by at least February 4, 2020, when it filed its original complaint. Even assuming the clock started that day, Two Roads still took over two years to name Defendants. Thus, even under Two Roads's theory of accrual, its operative complaint was untimely under 7 U.S.C. § 25(c).

### 2. Equitable Tolling

In the alternative, Two Roads contends that the district court should have granted it the benefit of equitable tolling, given the unforeseen difficulties it experienced in identifying Defendants. We disagree.

"Equitable tolling halts the limitations clock 'when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action.'" *Herrera*, 8 F.4th at 499 (quoting *Xanthopoulos v. U.S. Dep't of Lab.*, 991 F.3d 823, 831 (7th Cir. 2021)). In determining whether to apply equitable tolling, we "look at 'the entire hand' that [a plaintiff] was dealt." *Carpenter v. Douma*, 840 F.3d 867, 872 (7th Cir. 2016) (quoting *Socha v. Boughton*, 763 F.3d 674, 686 (7th Cir. 2014)). In other words, equitable tolling requires a "'flexible standard that encompasses all of the circumstances that [a plaintiff] faced and the cumulative effect of those circumstances' to determine whether they were 'extraordinary' and truly prevented timely filing of his [claim]." *Id.* (quoting *Socha*,

763 F.3d at 686). The plaintiff bears the burden of showing it satisfied the requirements for equitable tolling, *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 256 (2016), and we review a district court's denial of equitable tolling for abuse of discretion, *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Finally, it is worth noting that "[f]ederal courts have typically extended equitable relief only sparingly." *Herrera*, 8 F.4th at 499 (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)).

Two Roads claims that several "external roadblocks" prevented it from meeting the statute of limitations. First, it insists that the stay of discovery in the MDL (which lasted until April 21, 2020) barred it from ascertaining Defendants' identities. But Two Roads did not even file its initial complaint until February 2020, just days before the two-year limitations period expired. As a sophisticated party, Two Roads should have anticipated the difficulties in obtaining identification information from the Cboe and the need to file its complaint well before the passage of the two-year period.

Second, Two Roads contends it was delayed for over a year while it attempted to force Cboe to provide Defendants' identification. But the district court correctly concluded that these delays were the kind of ordinary delays inherent to litigation and did not warrant equitable tolling. *See Carpenter*, 840 F.3d at 872 (affirming the denial of equitable tolling because the plaintiff's circumstances were "nothing but ordinary").

Finally, Two Roads suggests it was delayed because Cboe initially had provided it with an erroneous SPX Options dataset. But this only costed the parties several months, and when we consider the "cumulative … circumstances," this delay pales in comparison to Two Roads's overall delay in filing

the lawsuit in the first place. *Id.* As such, we do not think the production of the erroneous dataset alone warrants equitable tolling under these circumstances.

In sum, the district court did not abuse its discretion when it denied Two Roads's request for equitable tolling. We echo the district court's suggestion that the outcome may have been different if Two Roads had filed its complaint soon after discovering its injury and had diligently sought to uncover Defendants' identities. But Two Roads's failure to file suit until two days before the ending of the limitations period undermines any claims of diligence. *See Herrera*, 8 F.4th at 499. We therefore affirm the district court's dismissal of Two Roads's complaint.[4]

**B. LJM**

### 1. Article III Standing

Before addressing the claims, we have "an obligation to assure ourselves" that LJM has Article III standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). We review a decision to dismiss for lack of standing *de novo*. *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023).

---

[4] The district court assessed "in the interest of completeness" whether Two Roads stated a CEA price manipulation and manipulative device claim on the merits. *LJM Partners*, 2023 WL 6311471, at *12. Because it is clear that Two Roads's complaint was untimely and that the district court did not abuse its discretion in denying equitable tolling, we need not reach this issue.

For Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation modified). As the party invoking federal jurisdiction, LJM bears the burden of establishing that standing exists. *See id.*

As is often the case, our standing analysis focuses on whether LJM meets Article III's injury-in-fact requirement. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). Although concrete injuries may be tangible or intangible, they must be "real[] and not abstract." *Id.* at 340 (internal quotation marks omitted). In other words, an injury "must actually exist." *Id.* Economic harms are among the "most obvious" of concrete injuries. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

At first blush, LJM's complaint appears to allege the sort of concrete economic injury the Supreme Court endorsed in *TransUnion*. For example, it alleges that, "[a]s a direct result of Defendants' unlawful conduct, LJM has *suffered actual damages and injury in fact due to incurring losses when transacting options* on S&P 500 Futures and E-minis at artificial prices on February 5 and 6, 2018." (emphasis added). It also claims that "LJM

was *further legally injured and suffered injury in fact* when it transacted in options on S&P 500 Futures and/or E-minis on February 5 and 6, 2018 in an artificial and manipulated market operating with the artificial prices caused by Defendants." (emphasis added). What is more, the complaint quantifies these losses, saying that "[b]y the close of trading on February 6, 2018, the net asset value of LJM—on a marked-to-market [sic] basis—had dropped to approximately $70.5 million, an 86.5% decline in the [sic] LJM's net assets."

These allegations seemingly suggest LJM experienced financial losses through its trading activities on February 5 and 6, which would typically satisfy Article III's injury-in-fact requirement. *See TransUnion*, 594 U.S. at 425. But we cannot read these allegations in isolation; rather, we must review them in the context of the entire complaint. *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 947 (7th Cir. 2024) (reminding that "our job is to read the complaint as a whole" and not to parse it "piece by piece"). Particularly salient here is footnote four of the complaint, which states: "For ease, throughout the Complaint, LJM *and the funds it managed* are collectively referred to as the entity harmed by Defendants' conduct and referred to as 'LJM.'" (emphasis added).

Thus, when the complaint refers to the losses "LJM" incurred, those "losses" include the losses suffered by LJM's *clients* whose money LJM managed. And, based on the way LJM has defined itself in its complaint, we have no way of knowing what proportion of the "losses" were suffered by LJM itself versus its clients. Indeed, the structure of the complaint makes it entirely possible that LJM did not lose *any* of its own money through its trades on February 5 and 6, 2018.

In *Indemnified Capital Investments, S.A. v. R.J. O'Brien and Associates, Inc.*, we held that investment losses to a client's account do not automatically accrue to the entity that managed the account. 12 F.3d 1406, 1409–10 (7th Cir. 1993). In that case, Indemnified Capital Investments ("ICI"), an investment company, sued a commodity futures trader for breach of fiduciary duty and violations of the CEA. *Id.* at 1407. ICI alleged it experienced losses in (1) client accounts that did not contain any of the company's own funds, and (2) house accounts that were partially funded with the company's own money. *Id.* at 1407–08. As for the former, we held that "the losses incurred by the ICI customer accounts accrued only to ICI's customers and are too attenuated to create standing for ICI." *Id.* at 1409. As for the latter, we said that "[i]f ICI actually funded the house account and suffered loss, then it ha[d] satisfied the injury in fact requirement." *Id.* at 1410.

Consistent with our holding in *ICI*, the losses LJM's clients incurred when those funds were liquidated "are too attenuated to create standing" for LJM. *Id.* at 1409. And, because of the ambiguity created by footnote four of LJM's complaint, we do not know whether LJM actually lost any of its *own* money by virtue of its trades on February 5 and 6, 2018. As such, we conclude that LJM's general allegations of trading losses are insufficient to constitute an Article III injury in fact.

LJM, however, advances a second argument. The company contends that it has alleged a concrete injury because its complaint says LJM served as general partner for six limited partnership funds it managed. The problem is that the complaint does not allege that these particular limited partnerships were among the accounts that lost money on February 5 and 6, 2018. Nor does the complaint specify exactly *how*

LJM's role as a general partner of these funds caused it concrete injury. Still, LJM insists such an inference is "common sense." For example, LJM's opening brief says that "[g]eneral partners in limited partnerships have powers, obligations, and liabilities arising from that role." It also states that "general partners reserve either ownership interests in partnership assets or compensation rights, or both."

But such attorney arguments are not enough. Although we are to draw all reasonable inferences in LJM's favor, we need more before we can infer that LJM was injured vis-à-vis its capacity as a general partner in these limited partnerships. For example, did the partnerships in which LJM was a general partner incur any losses due to Defendants' alleged conduct? Did LJM invest any of its own money in these partnerships? And how is LJM compensated for its role as general partner—does it share in the profits and losses or does it receive a flat administration fee regardless of performance? The complaint makes no attempt to fill these gaps, and we will not engage in "raw guesswork" to answer them ourselves. *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 472 (7th Cir. 2020).

Despite this, LJM points to two cases it claims support its theory that a general partner of a partnership is presumptively injured when the partnership is injured. But neither helps. The first is *Adco Oil Co. v. Rovell*, 357 F.3d 664 (7th Cir. 2004). There, Adco was a partner in a partnership called Hugoton Joint Venture ("HJV"). *Id.* at 665. When a dispute broke out over a disclosed trade secret, Adco assigned its rights to HJV to sue on its behalf. *Id.* Before the jury reached a verdict, HJV's lawyer negotiated a cap on the jury verdict that left Adco uncompensated, and Adco in turn sued the lawyer for malpractice. *Id.*

We concluded that Adco had Article III standing because it "want[ed] money damages for a tort, and a favorable judicial order would redress the injury." *Id.*

In other words, Adco had alleged it experienced its *own* injury under the theory that HJV's lawyer had directly harmed its possibility of recovery by negotiating a cap on the jury verdict amount. *Id.* Here, LJM does not cite its own injury as a general partner, but instead relies on the injury to the partnerships generally.

The second case is *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750 (7th Cir. 2008). There, the plaintiff claimed that the defendant improperly terminated a gas station's franchise rights in violation of the Petroleum Marketing Practices Act. *Id.* at 753. For standing, he alleged he was indirectly injured as the sole shareholder of the corporation that owned the gas station. *Id.* at 756. We agreed, concluding that he "satisfie[d] the minimum requirements of constitutional standing by virtue of an asserted indirect injury as [the corporation's] sole shareholder." *Id.*

Although *Rawoof* hits closer to the mark, it does not save LJM's complaint. We think it sufficiently obvious that a sole shareholder in a corporation experiences a concrete injury when the corporation is injured. *Cf. Korte v. Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013) ("[B]ecause corporate ownership is closely held, the mandate's indirect effect on the financial interests of [Plaintiffs] as controlling shareholders is a concrete injury sufficient to support Article III standing."). But, in such circumstances, the financial relationship between a corporation and its shareholders is clear. By contrast, the financial relationships between LJM in its capacity as general partner and the partnerships it managed are a mystery. Indeed, it is even

possible that the financial terms of that relationship may have differed across the various partnerships. The complaint gives no inkling one way or the other.

Lastly, LJM tries to establish injury in fact by claiming that Defendants' actions caused it to experience loss of future business and damage to its business reputation. LJM is correct that a plaintiff's "allegations of lost sales and damage to its business reputation" can confer Article III standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). But there are two problems with this argument. First, LJM did not raise it before the district court. *See St. Paul Fire*, 672 F.3d at 460 (arguments not raised before the district court are forfeited). Second, even if LJM had preserved the issue for appeal, these purported business injuries appear nowhere in the complaint.[5] *See Spokeo*, 578 U.S. at 338 ("[A]t the pleading stage, the plaintiff must clearly … allege facts demonstrating each element [of standing].") (internal quotation marks omitted).

### 2. Substitution Under Rule 17(a)(3)

Alternatively, LJM argues that the district court should have permitted it to substitute the real party in interest under Rule 17(a)(3). This rule provides that a court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been

---

[5] The closest the complaint gets is in an attached appendix, where it describes "LJM's" "very successful" history of profiting from its investment strategy. But this description of what had worked for LJM in the past does little to plausibly allege that it suffered a consequential business injury on February 5 and 6. Nor does it overcome the significant ambiguity created by the broad manner in which "LJM" is defined in the complaint.

allowed for the real party in interest to ratify, join, or be sub-stituted into the action." Fed. R. Civ. P. 17(a)(3). The district court declined LJM's request, concluding that Rule 17(a)(3)'s procedure "is only available to a plaintiff who has Article III standing" and "does not answer the question of whether LJM itself can bring an action." *LJM Partners*, 2023 WL 6311471, at *9.

To date, three circuits have considered whether a plaintiff lacking Article III standing may avail itself of Rule 17(a)(3). Like the district court, the Sixth Circuit has concluded that such a plaintiff cannot. *See Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002) (stating that, without standing, a plaintiff cannot "bring [an] action" or "make a motion to sub-stitute the real party in interest"). This view, sometimes called the "nullity doctrine," posits that when a plaintiff lacks stand-ing, there is no pending action into which the real party in interest can be joined or substituted. The Fourth Circuit came to a similar conclusion, albeit in an unpublished decision. *See House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 789–90 (4th Cir. 2019) ("[I]t is not [Plaintiff's] lack of capacity or his real-party-in-interest defect that forecloses a remedy under Rule 17, but rather the fact that [he] had no legal existence—and, thus, no standing to bring suit—at the time of filing.").

The Second Circuit, on the other hand, allows a plaintiff without standing to employ Rule 17(a)(3). *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021) ("Only if the real party in interest either fails to materi-alize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction."). Naming the wrong party in interest, the Second Circuit reasoned, "is akin to an error in the complaint's allegations of jurisdiction." *Id.* at 388.

And, the court continued, "it is well-understood that a plaintiff may cure defective jurisdictional allegations, unlike defective jurisdiction itself, through amended pleadings." *Id.* at 388–89.

On balance, we tend to think that the Second Circuit has the better approach. There is strong reason to believe that the nullity doctrine is not mandated by Article III's Cases or Controversy Clause. *See* 13A *Wright & Miller's Federal Practice & Procedure* § 3531 n.61 (3d ed. 2025); Ethan C. Treacy, Note, *The Nullity Doctrine*, 109 Va. L. Rev. 1331, 1364 (2023). To be sure, "the jurisdiction of the court depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)); *see also Lujan*, 504 U.S. at 570 n.5 (explaining that "standing is to be determined as of the commencement of suit"). But it is also true that "[t]he state of things and the originally alleged state of things are not synonymous." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (citations omitted). As such, "demonstration that the original allegations [are insufficient] will defeat jurisdiction" as "will the withdrawal of those allegations, *unless they are replaced by others that establish jurisdiction*." *Id.* (emphasis added) (citations omitted). "Thus," the Supreme Court continued, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Id.* at 473–74; *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35–36 (2025) ("So changes in parties, or changes in claims, effectively remake the suit. And that includes its jurisdictional basis: The reconfiguration accomplished by an amendment may bring the suit either newly within or newly outside a federal court's jurisdiction.").

If an amendment under Rule 15(a) can destroy or create federal subject matter jurisdiction, it is difficult to see why this reasoning should not extend to party substitutions under Rule 17(a)(3). Here, LJM may have been able to show that the facts on the ground demonstrate an injury in fact to a real party in interest. That Rule 17(a)(3) was designed to avoid forfeiture of meritorious claims further supports this approach. *See* Treacy, *supra* at 1343 n.78 ("Rule 17 is 'intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made[.]'") (quoting Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment).[6]

That said, we need not definitively decide this issue here, because even if LJM had been allowed to invoke Rule 17(a)(3), the claims would have run headlong into CEA's statute of limitations.

### 3. Timeliness

Even if LJM had been allowed to amend its complaint to add real parties in interest, we agree with the district court that the CEA's two-year statute of limitations nevertheless

---

[6] The pleading requirements contained in 735 Ill. Comp. Stat. 5/2-411(a) have little to do with whether LJM has itself experienced a concrete injury in fact sufficient to confer Article III standing. Whether a plaintiff has experienced an injury and whether they can successfully recover for that injury under relevant law are two distinct inquiries. *See Lexmark*, 572 U.S. at 128 n.4 ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case.") (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002) (emphasis in original)). To the extent the district court may have suggested otherwise, that was error.

would bar the CEA claims. A district court may dismiss on statute-of-limitations grounds when it is "clear from the face of the amended complaint that it is hopelessly time-barred." *Cancer Found.*, 559 F.3d at 675. And, as with Two Roads, LJM's complaint provides all the information we need to assess its timeliness.

As noted above, the statute of limitations under the CEA is two years, and the clock begins "when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." *Dyer*, 928 F.2d at 240 (citations omitted); 7 U.S.C. § 25(c). Therefore, the statute of limitations ran in February 2020. Although LJM timely filed its original complaint in January 2019, its original complaint only named the defendants as "John Does." It was not until August 2022—almost two and a half years after the statute of limitations ran—that LJM amended its complaint to name the actual defendants. LJM amended its complaint for a final time a month later in September 2022. When an initial complaint only names Doe defendants, amended complaints that add the names of defendants do not relate back to the date of the earlier complaint under Rule 15(c)(1)(C). *See Herrera*, 8 F.4th at 499. As a result, LJM's Third Amended Complaint was filed outside the statute-of-limitations period.

Like Two Roads, LJM has forfeited the argument that its claim accrued when it discovered Defendants' scienter by failing to raise it below. *See St. Paul Fire*, 672 F.3d at 460. But, even on the merits, LJM's original complaints demonstrate that it had reason to know of Defendants' allegedly culpable mental state when it filed them. For example, LJM claimed that it was virtually impossible that the spike in implied volatility that occasioned its losses could have been caused by anything

other than "manipulation by John Doe Defendants." LJM cannot now claim that it was not aware of Defendants' scienter until years later.

Because the claims are barred by the statute of limitations, to proceed, LJM must show that the district court abused its discretion when it denied LJM's request for equitable tolling. Given the record, however, LJM's invocation of equitable estoppel fares no better than that of Two Roads.

While acknowledging that LJM was more diligent than Two Roads, the court reasonably concluded that LJM had not diligently pursued its rights because even after the district court denied its first motion for expedited discovery, LJM did not fix the overbreadth problems in its second motion. Although LJM is correct that the court expressed concern about the inefficiency of granting LJM's request while the MDL proceeded on a separate schedule, the record shows that the court also raised concerns about the breadth of LJM's request with sufficient time for LJM to cure the issue. It was also reasonable for the district court to conclude that LJM's attorneys should have anticipated the hurdles in identifying the relevant defendants and adjusted their pace accordingly. Given those facts, we cannot say that the district court erroneously denied LJM equitable relief. Accordingly, even if LJM had been allowed to add additional parties under Rule 17(a)(3), the district court's refusal to apply equitable tolling was not an abuse of discretion.

*     *     *

For the foregoing reasons, the judgment of the district court is AFFIRMED.